**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

---

ESTATE OF ANTONIO BONACCORSO,

Plaintiff,

v. Case No. 24-cv-1528-pp

AKINADE FATEYE and MILWAUKEE COUNTY,

Defendants.

---

# REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT MILWAUKEE COUNTY

---

## INTRODUCTION

Defendant Milwaukee County (the "County") is entitled to summary judgment with respect to the claim brought against it by plaintiff, the Estate of Antonio Bonaccorso (the "Estate"). This is true for multiple independent reasons. First, the Estate cannot establish that a County employee violated Bonaccorso's Fourteenth Amendment rights, and this case does not fit the narrow circumstance where no proof of an underlying constitutional violation by a municipal employee is necessary because the system as a whole was deliberately indifferent to the quality of care being provided. Second, the Estate cannot point to a series of prior, similar constitutional violations sufficient to have put the County on notice that policies at the Milwaukee County Community Reintegration Center (the "CRC"), where Bonaccorso committed suicide, were constitutionally inadequate, and this is not one of the rare cases where a claim of single-incident *Monell* liability can succeed. Third, none of the Estate's specific theories of § 1983 liability on the part of the

County have any merit under *Monell* and its progeny. The Estate's complaint must be dismissed on summary judgment in its entirety as it relates to the County.

## ARGUMENT

### A. The Estate Cannot Establish a Constitutional Violation By an Employee of the County.

Ordinarily, a plaintiff must demonstrate that a municipal employee violated his constitutional rights as a necessary predicate to a *Monell* claim against the municipality. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curium) (reasoning that "neither [*Monell*] nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact . . . the officer inflicted no constitutional harm"); *see also Pulera v. Sarzant*, 966 F.3d 540, 555 (7th Cir. 2020); *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010). Here, the Estate points to no County employee other than defendant Akinade Fateye as a potential wrongdoer, but the undisputed facts do not allow for a reasonable inference that Fateye violated Bonaccorso's Fourteenth Amendment rights.

As the Estate observes, the relevant inquiry on a denial of medical care or failure to protect claim involving a pre-trial detainee such as Bonaccorso is objective. *Miranda v. County of Lake*, 900 F.3d 335, 352-54 (7th Cir. 2018) (holding that, under the Due Process Clause, the standard governing a claim for an alleged failure to provide adequate medical care is one of "objective reasonableness"); *see also Estate of Wallmow v. Oneida County*, 99 F.4th 385, 391 (7th Cir. 2024); *Pulera*, 966 F.3d at 550.

This objective inquiry turns on what a reasonable officer in the defendant's place would have understood under the relevant circumstances. *Pittman v. Madison County, Ill.*, 108 F.4th 561, 567 (7th Cir. 2024) ("[T]o prevail, [a plaintiff] must prove that the

defendants did not take reasonable available measures to abate the risk of serious harm to [the plaintiff], even though *reasonable officers under the circumstances would have understood the high degree of risk involved*, making the consequences of the defendants' conduct obvious.") (emphasis in original). That issue is to be judged from the perspective of a reasonable officer, knowing what the defendant officer knew at the time, rather than with the benefit of 20/20 hindsight. *Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022) (cited by the Estate) (noting that an assessment of objective reasonableness "must be made on the facts and circumstances of each particular case and from the perspective of a reasonable officer on the scene, including what the officer knew at the time") (internal quotation marks and citation omitted).

Thus, here, the critical question is whether a reasonable officer in Fateye's place, knowing what Fateye knew at the time, would have a recognized a serious risk that Bonaccorso would attempt suicide on the date of his death. The undisputed evidence unquestionably answers that question in the negative.

In fact, there is no reasonable inference that Fateye had any information that would have put a reasonable officer in his place on notice that Bonaccorso was a risk to commit suicide. Bonaccorso was not on a suicide watch. (ECF 41 ("DJPFOF") ¶ 55.) Fateye had never had any contact with Bonaccorso before the day of his suicide. (*Id.* ¶ 16.) That day, Fataye interacted with Bonaccorso multiple times after he was transferred onto the B2 cell block at approximately 9:00 a.m. (he spoke to him as he took him to his assigned cell, he checked on him when another resident in the cellblock told him Bonaccorso was having trouble beathing, he retrieved Bonaccorso's inhaler and gave it to him, he gave him his lunch, and he spoke to him about finding a Quran for him), but Bonaccorso did not do or say anything that led Fateye to be concerned about his safety, and no one—including

medical staff—told Fateye that Bonaccorso was in mental or emotional distress or that he was a risk to commit suicide. (*Id.* ¶¶ 7-9, 12, 15-27, 40-42, 54-55.) Fateye last conducted a full set of rounds in B2 at 1:48 p.m., and Bonaccorso did not do or say anything as Fateye checked on him that led Fateye to be concerned about his safety at that point, either. (*Id.* ¶¶ 28-29, 40-42.)

Given this undisputed record, there simply is no evidence that would support a rational inference that any reasonable corrections officer in Fateye's place would have been on notice that Bonaccorso was a risk to take his life that day. As the Seventh Circuit has pointedly observed, "when an officer has no reason to think a detainee is suicidal, it is not objectively unreasonable to take no special precautions." *Jump v. Village of Shorewood*, 42 F.4th 782, 793 (7th Cir. 2022). Further, given that Bonaccorso had been escorted to the medical clinic after his transfer onto B2, a reasonable officer in Fateye's place would have been entitled to rely on the fact that he returned to the cellblock without having been placed on any special watch status. *Miranda*, 900 F.3d at 343 ("When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention."); *see also McGee v. Parsano*, 55 F.4th 563, 573 (7th Cir. 2022).

Nothing about this conclusion is altered by the fact that B2 was a segregation housing unit. A generalized heightened risk (of persons on a segregation unit harming themselves, for instance), not specific to the plaintiff and not pointing to suicidality on the individual plaintiff's part, is insufficient to put a reasonable officer on notice of a serious risk of suicide. *Estate of Wallmow*, 99 F.4th at 391 ("The facts should point directly at suicidality, for a deceased's 'general distress and history of psychiatric treatment would give a reasonable officer notice of general distress and a history of

psychiatric treatment, not risk of suicide.'") (quoting *Jump*, 42 F.4th at 794); *Pulera*, 966 F.3d at 551 (holding that information about the detainee being prescribed medication for clinical depression and close family members of the detainee having recently committed suicide were insufficient to raise a material dispute of fact given the absence of "more or more significant indirect signs" that the detainee himself was suicidal).

Likewise, nothing about Bonaccorso's medical or mental health history at the CRC alters this conclusion. Most importantly, the Estate offers no evidence whatsoever that a reasonable officer in Fateye's place would have been aware of any symptoms shared by Bonaccorso with CRC medical or mental health staff or statements made by Bonaccorso to family members by phone or via an electronic tablet in the days and weeks leading up to his suicide. Those symptoms and messages, which Fateye was not aware of (*see* DJPFOF ¶¶ 40-41), cannot possibly be part of what he knew (or what a reasonable officer in his place would have known) at the time of Bonaccorso's suicide. As a result, that information is immaterial to the objective reasonableness analysis. *See*, *e.g.*, *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) ("A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.").

Regardless, the undisputed evidence is that the medical and mental health staff who repeatedly assessed and cared for Bonaccorso never reached the clinical judgment that he was a risk to commit suicide, despite knowing of the complaints and symptoms referenced by the Estate. (*See* DJPFOF ¶¶ 70-72; Response to PPFOF ¶¶ 39-48, 50-51, 54.) As noted above, Fataye (and any reasonable officer in his place) was entitled to rely on the professional judgment of the medical and mental health staff in assessing Bonaccorso's risk of suicide (or the lack of any such risk).

Finally, the fact that Fateye did not conduct a full set of wellness rounds in the B2 cellblock between 1:48 p.m. and 2:33 p.m. on the afternoon of Bonaccorso's suicide also does not support the Estate's claim. The County does not contest that a 45-minute gap in wellness rounds violates CRC policy, as, by policy, wellness rounds involving direct personal observation of each resident by the assigned corrections officer are to occur at least once every 30 minutes in the B2 cellblock. (DJPFOF ¶¶ 49-51.) But, as the Estate concedes, a violation of departmental policy does not amount to a constitutional violation. *Estate of Wallmow*, 99 F.4th at 392 ("As the Estate admits, a violation of a jail policy is not a constitutional violation.") (internal quotation marks and citation omitted); *see also Pulera*, 966 F.3d at 551; *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006).

**B. *Glisson* and *Woodward* Provide No Support to the Estate.**

While, in theory, a circumstance might exist where a plaintiff can establish the necessary predicate for a *Monell* claim without establishing an underlying constitutional violation by a municipal employee, this is not such a case.

For starters, the Estate offers only a conclusory argument to this effect but cites to no support for the argument. (*See* ECF 53 at 14.) Such an undeveloped argument is considered waived. *See, e.g., Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016). Regardless, to the extent the Estate seeks to draw from the holding in *Glisson v. Indiana Dept. of Corrections*, 849 F.3d 372 (7th Cir. 2017), any attempted comparison fails. *Glisson* involved a situation where the plaintiff alleged that the defendant public entity had a "deliberate policy not to require any kind of formal coordination of medical care either within an institution . . . or across institutions for prisoners who are transferred." *Id.* at 379. In that circumstance, the Seventh Circuit reasoned, an individual provider might not act with deliberate indifference even though

the system as a whole was deliberately indifferent. *Id.* at 378.

Here, in sharp contrast, there is zero evidence of such a deliberate policy not to require any form of coordination of medical care within the CRC. To the contrary, the undisputed evidence is that CRC policy required medical and corrections staff to coordinate. In fact, by policy, health care staff at the CRC are required to inform corrections staff of any specific safety concerns with respect to a particular resident arising from the resident's medical or mental health status or history. (DJPFOF ¶ 75.) For instance, if a resident is placed on a suicide watch or requires other enhanced monitoring due to the resident's medical or mental health status or history, Wellpath medical staff will communicate directly with corrections staff regarding the watch or the need for enhanced monitoring. (*Id.* ¶ 76.) Further, by policy, upon notification that a CRC resident has been placed in segregation, health care staff are required to review the resident's health record to determine whether his existing health care needs require accommodation or preclude safely housing the resident in segregation. (*Id.* ¶¶ 73-74.) In the event such accommodations are required or the resident cannot safely be housed in segregation, the policy requires the health care staff performing the review to notify appropriate corrections staff. (*Id.*) In the face of these facts, none of which are genuinely disputed by the Estate, there is no reasonable basis for a jury to infer the existence of the type of systemic failure that formed the basis for the holding in *Glisson*.

Neither is there any evidence of any "systemic non-implementation of suicide-prevention procedures" of the kind that would fit what the Seventh Circuit found in *Woodward v. Correctional Medical Services of Ill., Inc.*, 368 F.3d 917 (7th Cir. 2004). In *Woodward*, the Seventh Circuit noted specific evidence of a culture that permitted violations of policies designed to protect inmates and that the defendant health care

provider condoned its employees not following suicide prevention policies. *Id.* at 929. Put simply, there is no comparable evidence of any kind in the record here. Absent such evidence, the Estate also cannot draw support from the holding in *Woodward*.

### C. Regardless, None of the Estate's Specific Theories of *Monell* Liability Can Survive Summary Judgment.

#### 1. The Estate Cannot Sustain Its Burden to Prove a Custom or Practice on the Part of the County.

The Estate concedes it has no evidence of prior, similar constitutional violations sufficient to have put the County on notice of a problem with its policies or to demonstrate deliberate indifference on its part. This normally would be enough to doom the Estate's claim against the County. *See, e.g.*, *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985) ("But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation.").

Lacking such evidence, the Estate hinges its case against the County on the so-called "single-incident" theory of *Monell* liability. In *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), the Supreme Court hypothesized about a situation where the unconstitutional consequences of a failure to train might be so obvious that one could infer deliberate indifference on the part of the municipality even without a pattern of similar, prior violations. 489 U.S. at 390 n.10. Such "single-incident" liability, however, is strictly limited to "a narrow range" of circumstances. *Connick v. Thompson,* 563 U.S. 51, 64 (2011). Such "single-incident" cases are ones where "a violation of federal rights [is] a highly predictable consequence" of a municipality's failure to act. *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 409 (1997); *see also J.K.J. v. Polk*

*County*, 960 F.3d 367, 382 (7th Cir. 2020) (en banc). This case is nothing like the scenarios of potential single-incident *Monell* liability hypothesized by the Supreme Court.

For starters, the Estate does not even assert a failure to train theory of *Monell* liability, which was context for the discussion in *Canton* of the possibility of single-incident *Monell* liability. (*See* ECF 44-4 at Answer to Int. 9.) Regardless, unlike in the scenario envisioned by the Court in *Canton*, the undisputed facts here do not demonstrate any failure to train. To the contrary, the undisputed facts reflect that the County trains its officers to perform 30-minute checks on residents in segregation units such as B2 and to personally observe residents during those checks. (DJPFOF ¶¶ 49-51, 58-60; Response to PPFOF ¶¶ 8-9, 11, 57.) Likewise, the undisputed facts reflect that the County trains its officers to monitor all residents for signs that they might be at risk of harming themselves. (*Id.* ¶¶ 67-68.) Finally, the undisputed facts reflect that corrections staff and medical and mental health staff are trained to communicate when residents require additional monitoring due to their medical or mental health status. (*Id.* ¶¶ 73-76.) In other words, this is not a situation where staff lack any necessary training despite knowledge on the part of the County that staff will be faced with suicidal inmates in their care and custody. Reacting to a similar scenario in *Connick*, the Supreme Court rejected the possibility of *Monell* liability. 563 U.S. at 67.

The Seventh Circuit has expressly noted that the circumstances that might meet the high bar for "single-incident" *Monell* liability "are rare." *Orozco v. Dart*, 64 F.4th 806, 825-26 (7th Cir. 2023) (further noting that ""[a] constitutional violation must be a blatantly obvious consequence of inaction for single-incident liability" to apply) (internal quotation marks and citation omitted). Moreover, the few examples in which the Seventh Circuit has arguably applied the single-incident theory to date bear no resemblance

whatsoever to the record here. *See, e.g., Flores v. City of South Bend*, 997 F.3d 725, 733-34 (7th Cir. 2021) (holding that complaint stated a claim under single-incident theory insofar as it alleged that defendant municipality had actual knowledge that its officers had a history of criminally reckless speeding and that the city had acted with deliberate indifference by failing to address the known problem); *J.K.J. v. Polk County*, 960 F.3d at 381-84 (upholding jury verdict based on single-incident theory where record at trial included evidence of notice to the defendant county that its policies and training were insufficient by way of prior sexual misconduct by its jail staff and proof of the absence of any real training of staff sufficient to prevent and detect such misconduct); *Glisson*, 849 F.3d at 382 (holding summary judgment was inappropriate when evidence demonstrated that jail healthcare provider had notice of the problems associated with having no polices providing for the coordinated care of complex, chronic illnesses and did nothing to address the risk); *King v. Kramer*, 680 F.3d 1013, 1020-21 (7th Cir. 2012) (reversing summary judgment where evidence showed facility had policy of switching inmates off prescribed medications without appropriate physician oversight and had notice of resulting problems); *Woodward*, 368 F.3d at 921, 925-29 (affirming jury verdict in favor of plaintiff when record established that jail health care provider did not train its employees on its suicide prevention policies, did not monitor compliance with policies, and had long condoned widespread violations of policies).

Here, there is nothing supporting the imposition of single-incident liability on the County aside from the Estate's general invocation of the theory. There is no evidence, for instance, of knowledge on the part of the County of problems flowing from its policies or training as in *Flores*, *Polk*, and *King*. Likewise, as is discussed above, this case is like neither *Glisson* nor *Woodward*. In short, there is absolutely no proof that any problems

with respect to the coordination among medical and corrections staff, the monitoring of resident communications, or officers' performance of wellness rounds in segregation were patently obvious to the County or a known, highly-predictable consequence of its policies or training. To accept a single-incident theory of County liability on this record would be to convert the theory from the rare exception to an every-case means of establishing *Monell* liability and all but impose *respondeat superior* liability. This is exactly what the Supreme Court has warned lower courts not to do. *See*, *e.g.*, *Connick*, 563 U.S. at 70 ("[W]e must adhere to a stringent standard of fault, lest municipal liability under § 1983 collapse into *respondeat superior*.") (internal quotation marks and citation omitted).

### 2. The Three Specific Theories Offered by the Estate Cannot Sustain Its *Monell* Claim.

In addition to the over-arching failure of the Estate's claim against the County, its three specific theories of *Monell liability* also each fails for additional independent reasons.

#### a. The County's Alleged Custom of Not Personally Checking on the Safety of Residents in Segregation.

The Estate's theory that the County had a custom of officers not personally checking on residents in segregation is premised entirely on conclusory testimony by Fateye that he believed other officers used the pipe chase in the segregation units as he did on afternoon of Bonaccorso's suicide. This lone bit of evidence is wholly insufficient to form the basis of a legally-sufficient *Monell* claim against County.

First, the Estate lays no specific foundation or context for Fateye's testimony (*i.e.*, what specifically he was saying, and did he have personal knowledge for that statement). (*See* Response to PPFOF ¶ 13.) Specifically, although Fateye testified that he believed it was "not only me using the pipe chase" and "many of them use it," he did not actually

testify that he had personal knowledge of other officers using the pipe chase instead of making direct observation, as required by CRC policy, and the Estate offers no foundation for its extrapolation from Fateye's conclusory testimony. (*Id.*)

Regardless, Fateye's testimony—even taken at face value—does not show that the County had knowledge of any alleged practice of officers using the pipe chase to substitute for full wellness checks. Indeed, the Estate offers no evidence of other officers getting caught using the pipe chase as did Fateye, of other, similar problems resulting from use of the pipe chase prior to Bonaccorso's suicide, or of any other source of notice to the County of such a practice on the part of its officers. Nor does the Estate offer any evidence or other legal support for the conclusion underlying its theory—namely, that an officer using the pipe chase to supplement his full wellness checks presents a *constitutional* problem and not just a *policy* problem.

Further, the Estate offers no evidence that the County, armed with notice that officers were using the pipe chase in a way that violated CRC policy, ignored any such problem or otherwise responded with deliberate indifference. In fact, the only evidence of record on this point is that Fateye himself was disciplined—terminated, in fact—as a result of his use of the pipe chase. (*See* Response to PPFOF ¶ 72.)

Absent evidence both of notice to the County of officers using the pipe chase in a way that was constitutionally problematic and that the County was deliberately indifferent to the problem, the Estate cannot sustain a *Monell* claim based on this theory.

**b. The County's Alleged Custom of a Lack of Communication Between Health Care and Corrections Staff.**

The Estate's second theory of *Monell* liability—that, by custom, there was a lack of communication among medical and corrections staff at the CRC—simply ignores the undisputed factual record and is legally deficient in any event.

In fact, there is no evidence of an "information barrier" between medical and mental health staff and corrections staff at the CRC. The evidence is entirely to the contrary. While, as the Estate points out, medical staff do not share HIPAA-protected information about CRC residents, by policy, they are required to inform corrections staff of any specific safety concerns with respect to a particular resident arising from the resident's medical or mental health status or history, including when a resident is placed on a suicide watch or requires other enhanced monitoring due to the resident's medical or mental health status or history. (DJPFOF ¶¶ 75-76; Response to PPFOF ¶¶ 24-25.) Further, by policy, upon notification that a CRC resident has been placed in segregation, health care staff are required to review the resident's health record to determine whether his existing health care needs require accommodation or preclude safely housing the resident in segregation and, if so, to notify appropriate corrections staff. (*Id.* ¶¶ 73-74.)

Moreover, the Estate offers no evidence at all that these policies are not followed by staff at the CRC. As noted above, the Estate offers no evidence outside of the events specifically relating to Bonaccorso. And, as it relates to Bonaccorso, the evidence reflects that Bonaccorso was repeatedly seen by medical and mental health staff, but was never medically assessed as being suicidal and was not on a special watch on the date of his suicide. (DJPFOF ¶¶ 70-72; Response to PPFOF ¶¶ 39-48, 50-51, 54.) Simply put, medical staff never communicated with corrections staff that Bonaccorso should be placed on a

suicide watch, because medical staff never reached the clinical judgment that such special precautions were necessary. (*Id.*)[1]

The Estate's theory otherwise has no basis in law or fact. Any reliance by the Estate on standards issued by the American Correctional Association (the "ACA") is misplaced, as ACA standards do not equate to constitutional minimums. *Bell v. Wolfish*, 441 U.S. 520, 543 n.27 (1978) ("And while the recommendations of these various groups [issuing correctional standards] may be instructive in certain cases, they simply do not establish the constitutional minima . . . ."); *see also Rhodes v. Chapman*, 452 U.S. 337, 348 n.13 (1981); *Mays v. Dart*, 974 F.3d 810, 823 (7th Cir. 2020); *J.K.J. v. Polk County*, 960 F.3d at 384. Furthermore, the existence of a better practice does not mean the existing one is unconstitutional. *Smith v. Sangamon Cty. Sheriff's Dep't*, 715 F.3d 188, 191 (7th Cir. 2013) ("The existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent.") (citation omitted); *see also Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997); *Riccardo v. Rausch*, 375 F.3d 521, 528 (7th Cir. 2004).

Regardless, the Estate stakes a position that is not even required by ACA standards. The Estate argues that it can sustain its *Monell* claim based on the fact that no notice of Bonaccorso's transfer to B2 was given to medical staff *before* the transfer occurred. Yet, ACA standards require nothing beyond notice to medical staff of such a transfer shortly *after* the transfer and do not impose a timeframe by which medical staff are to then assess

[1] In this respect, *Cavalieri v. Shepard*, 321 F.3d 616 (7th Cir. 2003), cited by the Estate, is inapposite. *Cavalieri*, in relevant part, was about the failure of an officer with specific knowledge of a suicide risk not acting on that knowledge. No such failure can be proven here on the part of CRC medical staff, and the Estate does not sue any member of the medical staff in any event. And, for the reasons discussed above, no such failure can be proven on the part of Fateye, either.

whether special precautions are needed as a result of the transfer. (*See* Response to PPFOF ¶¶ 29-30, 32, 36-38.) And it is undisputed that medical staff at the CRC were in fact notified that Bonaccorso had been transferred to B2 the same morning as the transfer (and again early that afternoon). (*See* DJPFOF ¶¶ 12-14, 30.)

Here, the bottom line is that the Estate has put forth no legal authority for the proposition that "immediate" notice of an inmate entering segregation—whatever that amounts to—is required by Fourteenth Amendment. Likewise, there is no evidence of record that the County was on notice that its existing policies regarding coordination among health care and security staff were causing problems or that, with such notice, the County responded with deliberate indifference. As a result, the Estate's second theory of *Monell* liability also must fail as a matter of law.

#### c. The County's Alleged Custom of Failing to Monitor Resident Telephone Conversations or Electronic Messages.

The Estate's final theory of *Monell* liability—that the County has a custom of not reviewing phone calls and tablet messages for all CRC residents in real time—also fails.

Again, the Estate all but ignores the evidence of record. There is no policy of monitoring resident calls and messages in real time. (DJPFOF ¶ 63.) To do so would be impossible given the number of residents and staffing levels. (*Id.* ¶¶ 61-64.) Instead, calls and messages are recorded and are reviewed after the fact if a concern arises. (*Id.* ¶ 65; Response to PPFOF ¶ 20-22.)

The Estate focuses on the written policy regarding resident phone calls and messages, theorizing that there may be a difference between the policy as written and the monitoring of calls and messages as it occurs in practice. Even if such a gap existed, however, it would not constitute proof of a constitutional wrong. Again, policy violations

are not proof of constitutional violations, and the Estate offers no case law holding that real-time monitoring of all inmate calls and messages is required by the Fourteenth Amendment. And, as is true with respect to all of its *Monell* theories, the Estate points to no evidence establishing that the County was on notice of a problem with its monitoring policy or practices based on prior, similar constitutional violations or that the County, armed with such knowledge, reacted with deliberate indifference.

## CONCLUSION

This Court should grant summary judgment to Milwaukee County.

Dated at Milwaukee, Wisconsin this 14th day of October, 2026.

**HANSEN REYNOLDS LLC**

/s/ Andrew A. Jones
Andrew A. Jones
WI State Bar No. 1023074
301 North Broadway, Suite 400
Milwaukee, Wisconsin 53202
(414) 455-7676
ajones@hansenreynolds.com

*Attorneys for Defendant Milwaukee County*